**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MEMC ELECTRONIC MATERIALS,**<br> **et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:12-CV-344** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **KARTHIK BALAKRISHNAN,** | : | **Magistrate Judge Norah McCann** |
| | : | **King** |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

Plaintiffs MEMC Electronic Materials, Inc. and MEMC Pasadena, Inc. (collectively referred to as "Plaintiffs" or "MEMC") seek a preliminary injunction against Defendant Karthik Balakrishnan, until trial, to prevent him from: (1) working for Iosil Energy Corporation ("Iosil") in any capacity, and (2) improperly using and disclosing MEMC's confidential, proprietary information and trade secrets.  (Doc. 49, 50.)  Upon this Court having held a preliminary injunction hearing and the parties having filed post-hearing briefs, (Doc. 48–51), this matter is now ripe for decision.  For the following reasons, MEMC's motion for a preliminary injunction is **GRANTED** in part and **DENIED** in part.  This Court preliminarily enjoins Balakrishnan from using and disclosing MEMC's confidential, proprietary information and trade secrets, but not from working at Iosil.

## I. BACKGOUND

### *A. Factual History*

Many of the facts in this case are disputed by the parties.  The Court attempts to identify the points of contention below.

#### 1. Balakrishnan's Work Experience Prior to Joining MEMC

Balakrishnan holds a PhD from Washington University where he studied, among other things, multi-phase reaction engineering and semiconductor material processing.  Before joining MEMC, Balakrishnan worked at General Electric for nine years, implementing new technology into the manufacturing process, operating reactors using multi-phase reaction engineering, and working on pilot plants.

#### 2. MEMC's Business Operations and Balakrishnan's Responsibilities at MEMC

MEMC Electronic Materials, Inc. is a Delaware corporation with its principal place of business in St. Peters, Missouri.  MEMC Pasadena, Inc. is also a Delaware corporation with its principal place of business in Pasadena, Texas.  Balakrishnan started at MEMC in August, 2009, and served as Director of Polysilicon Product Technology at MEMC Pasadena, Inc.  MEMC's major market segments are semiconductor materials, solar materials, and energy.  MEMC Pasadena, Inc., where Balakrishnan worked, produces granular polysilicon, which is the base material used in manufacturing silicon wafers.  Silicon wafers are used in the semiconductor industry.   The parties dispute the extent of MEMC's involvement in the polysilicon industry.

There are several basic methods that can be employed to manufacture polysilicon, but the two primary methods use either a fluidized bed reactor ("FBR") or a Siemens reactor, and the same general three steps are used in both of these methods.  First, impure silicon is reacted with other materials to form a gas containing silicon and some other chemical compound (including,

but not limited to, chlorine, hydrogen, iodine, or bromine).  Second, the resulting gas is purified in a distillation process.  Third, the polysilicon is extracted from those purified gases in a process called chemical vapor deposition.  This last deposition phase is accomplished in either a FBR or Siemens reactor.  What differentiates polysilicon manufactures from one another is how well each step is managed.

MEMC asserts that it has performed extensive research and development, and invested a significant amount of time and money, in the FBR and Siemens reactor methods, and that both methods are essential to its business.  New technologies at MEMC are generally kept as trade secrets rather than put into patents.  If a competitor has access to these trade secrets, MEMC explains, the learning curve for producing polysilicon can be reduced greatly.

MEMC also argues that Balakrishnan was exposed to a number of its trade secrets.  He was responsible for taking research and development ideas and transferring those ideas to the manufacturing floor.  Balakrishnan was involved in research and development related to both FBRs and Siemens reactors.  He had access to important presentations, discussions, and key metrics at MEMC.

Balakrishnan disputes MEMC's characterization of its business, and contends that polysilicon is simply a raw material used by MEMC to make its final products.  Balakrishnan argues that MEMC does not make polysilicon for sale.  There was testimony at the hearing that as of April 30, 2012, MEMC could buy granular polysilicon cheaper than it could produce it.

Balakrishnan explains that his responsibilities at MEMC were well-defined.  He primarily worked on: production of the input raw material silicon tetrafluoride, used in producing silane; production of hydride, used to make silane gas; production of silane gas; improvement of the existing FBR in Pasadena; and recovery of waste from the silane process.  Balakrishnan asserts

that he did not work on MEMC's Merano, Italy plant or its Siemens reactors.  He also testified that he did not work on kerf recovery or recycling at MEMC or MEMC's proposed joint venture with Samsung.

### 3. Balakrishnan's Agreement with MEMC

Balakrishnan entered into an agreement with MEMC when he started work in August, 2009.  Because of an explosion that occurred on MEMC's plant on Balakrishnan's first day, Balakrishnan testified that he went through his paperwork quickly and did not review the agreement because his immediate help was needed at the site of the explosion.  A section in the agreement entitled "Confidential Information" provides that Balakrishnan will use his "best efforts and diligence both during and after [his] MEMC employment to protect the confidential, trade secret and/or proprietary character of all Confidential Information."  (Doc. 1-1 at 2.) Balakrishnan will also refrain from "directly or indirectly, us[ing] (for [himself] or another) or disclos[ing] any Confidential Information, for so long as it shall remain proprietary or protectable as confidential or trade secret information."  (*Id.*)

The "Competitive Activity" section of agreement restricts Balakrishnan's ability to engage in certain competitive activities:

> I shall not, directly or indirectly (whether as owner, partner, consultant, employee or otherwise), at any time during the period of two (2) years following termination for any reason of my final employment with MEMC, engage in or contribute my knowledge to any work or activity that involves a product, process, apparatus, service or development which is then competitive with or similar to a product, process, apparatus, service or development on which I worked or with respect to which I had access to Confidential Information while at MEMC at any time during the period of five (5) years immediately prior to such termination ("Competitive Work"), unless I first obtain the express written consent of a duly authorized offer of MEMC, which consent may be withheld in MEMC's sole discretion.  Following the expiration of said two (2) year period, I shall continue to be obligated under the "Confidential Information" section of this Agreement not to use or disclose Confidential Information so long as it shall remain

> proprietary or protectable as confidential or trade secret.  For purposes of this
> paragraph, a semiconductor device shall not be considered competitive with, or
> similar to, any product of MEMC.

(*Id.*)  Finally, the agreement provides that it "shall be construed under the laws of the State of

Missouri."  (*Id.* at 4.)

### 4. Security at MEMC

MEMC presented testimony at the hearing that it takes measures to protect its trade

secrets by: limiting access to information based upon an employee's level in the company;

requiring employees to sign confidentiality and non-disclosure agreements; having security

checkpoints; allowing access to the facility with badges only; locking and securing the premises;

shredding important information; and protecting computers with passwords that must be changed

frequently.

There was also testimony at the hearing, however, that badges are not always checked at

MEMC.  Balakrishnan points out that there is no hard drive encryption or other security

measures used on MEMC's portable laptop computers, even though employees and contractors

are permitted to remove the laptops from MEMC property.

### 5. Balakrishnan's Departure from MEMC

In November 2011, Balakrishnan told his supervisor at MEMC that he was leaving for

vacation.  Balakrishnan stopped going to work on November 11, 2011, but he was not on

vacation.  Instead, he began work at Iosil's Groveport, Ohio manufacturing plant on November

14, 2011.  Balakrishnan had signed an offer letter with Iosil, on October 6, 2011, more than a

month prior.  Nevertheless, his effective resignation from MEMC was not until November 27,

2011.  Upon resigning, Balakrishnan told his supervisor at MEMC, Steve Wachnowsky, that he

was moving to Canada to be with his wife.  On March 7, 2010, MEMC learned Balakrishnan was not in Canada, but had joined Iosil in Ohio.

After Balakrishnan's departure, MEMC hired forensic investigators, Kroll Ontrack ("Kroll"), to examine Balakrishnan's MEMC laptop.  Kroll's investigation revealed ten mass storage devices had been connected to Balakrishnan's laptop in the seven-week period between October 6, 2011 and November 26, 2011.  At the hearing, Balakrishnan admitted that he did use eight of the ten storage devices.  He no longer had the devices, though, because he "used to leave them laying around in [his] car in Houston and not keep up with them,"  "they went bad," and he eventually threw them away.  (Doc. 44 at 313:2–4.)

Kroll also discovered that, between September 2, 2011 and November 13, 2011, data destruction applications had been installed, run, and subsequently uninstalled.  Balakrishnan conceded at the hearing that he ran data destruction applications.   MEMC points out that because these programs were run, it is now impossible to ascertain how much data was deleted or transferred from Balakrishnan's MEMC laptop.  According to Kroll, Balakrishnan accessed his laptop as late as November 27, 2011.

Balakrishnan argues that the reliability of Kroll's analysis is questionable because MEMC failed to secure the laptop after he returned it in late November 2011, and Kroll did not receive the laptop for analysis until January 31, 2012.  Kroll's forensic evidence does not show any wrongdoing, Balakrishnan contends, and can be parsed into the following three categories: (1) five laptop files; (2) six link files showing files that were accessed on external devices; and (3) data deconstruction applications.

As for the five laptop files, one was accessed on November 6, 2011, and four were accessed on November 19, 2011.  Balakrishnan refers to the file accessed on November 6, 2011,

as the "Poly Strategy" file, and presented testimony at the hearing that this file was accessed in connection with a presentation Balakrishnan was working on for MEMC.  As for the other four files, Balakrishnan could not have accessed the files on November 19, because: he used data deconstruction applications prior to November 19; he had already packed his laptop to send back to MEMC as of November 19; and Gail Coppens, a physiotherapist who owned a clinic that Balakrishnan's wife was contemplating purchasing, testified at her deposition that Balakrishnan and his wife were with her at her clinic on November 19.  Coppens testified that she never observed Balakrishnan on a laptop that day.

As for the six link files showing files that were accessed on external devices, Balakrishnan contends that the use of flash drives was commonplace at MEMC.  Only one of the six link files pointed to MEMC files, and those files were related to an MEMC project Balakrishnan was working on at the time they were accessed.

Finally, with respect to the data deconstruction software, Balakrishnan ran the software because he placed personal information on his laptop, which included banking, immigration, and tax information, as well as information about Gail Coppens's clinic.  This practice was not prohibited by MEMC policy.

### 6. Iosil's Business Operations and Balakrishnan's Responsibilities at Iosil

The parties disagree about how to categorize Iosil's primary business, and whether Iosil is MEMC's competitor.  MEMC asserts that Iosil is trying to compete in the polysilicon marketplace, which MEMC argues is evident from all three of Iosil's anticipated growth paths— licensing technology, pursuing joint collaborations in the polysilicon industry, and manufacturing polysilicon directly.  Balakrishnan contends that Iosil is not MEMC's competitor. Iosil explores technology related to the use of iodine in polysilicon production.  Iosil's goal is to

demonstrate the scalability of the iodine process, not to manufacture polysilicon, whereas

MEMC produces semiconductor and solar materials.  Balakrishnan also notes that Iosil has no

plans involved in: production of granular polysilicon, kef recovery, and ingot, wafer, solar cell,

or solar module production.  Balakrishnan responsibilities at Iosil include building the pilot plant

and chemical production, specifically, reacting metallurgical grade silicon with iodine.  MEMC

has never used iodine or metallurgical grade silicon in polysilicon production.

### B. Procedural History

MEMC filed its complaint and motion for a temporary restraining order ("TRO") on

April 18, 2012.  (Doc. 1, 3.)  This Court held a Local Rule 65.1 conference on April 19.  Both

parties were present and had the opportunity to be heard.  On April 20, MEMC's TRO was

granted, and Balakrishnan was temporarily enjoined and restrained from, *inter alia*: (1) "[u]sing

or disclosing any confidential, proprietary, and/or trade secret information of MEMC";

(2) "[e]ngaging in or contributing knowledge to any work or activity that involves a product,

process, apparatus, service, or development which is then competitive with or similar to a

product process, apparatus, service, or development on which Balakrishnan worked or with

respect to which Balakrishnan had access to Confidential Information while at MEMC (including

by working for Iosil Energy Corporation)"; and (3) "[b]reaching the terms and conditions of the

Agreement."  (Doc. 8.)  The TRO remains effective until this Court's ruling on MEMC's request

for a preliminary injunction.

This Court held a preliminary injunction hearing on June 1, 2012.  The parties filed post-

hearing opening and reply briefs, which became ripe for review on July 9, 2012.

## II. STANDARD OF REVIEW

A preliminary injunction is a remedy used by the court to preserve the status between the parties pending trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). When determining whether to grant a preliminary injunction, this Court must balance the following four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

These factors are not prerequisites, but are factors that are to be balanced against each other. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).[1]

---

[1] In his reply brief, Balakrishnan contends that "[t]o prevail on its request for a preliminary injunction, MEMC, must prove each of the four preliminary injunction factors by clear and convincing evidence." (Doc. 51.) Balakrishnan's characterization of the law is incorrect. When determining whether to grant a preliminary injunction, courts are engaging in a balancing exercise. For example, if three of the four factors weigh in favor of granting the preliminary injunction, and the fourth factor weighs in favor of denying the injunction, the court can, nevertheless, grant injunctive relief. Due to the limited purpose of a preliminary injunction, and given that the hearing is often in haste, "[a] party . . . is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Texas*, 451 U.S. at 395. The case law cited by Balakrishnan does not support his contention that each factor of the balancing test must be proven by clear and convincing evidence in order for the Court to grant injunctive relief. *See Corl v. Citizens Bank*, Case No. 2:08-CV-234, 2008 U.S. Dist. LEXIS 82676, at *6–7 (S.D. Ohio July 1, 2008) (explaining that "[u]nlike a preliminary injunction, a permanent injunction requires Plaintiff to show actual success on the merits, rather than a mere likelihood of success on the merits, as well as a demonstration that she has already suffered irreparable injury," and that plaintiff must demonstrate his or her right to this permanent injunctive relief by clear and convincing evidence); *Chicago Title Ins. Corp. v. Magnusson*, 487 F.3d 985, 991 (6th Cir. 2007) (explaining that a plaintiff has a burden of showing that a covenant not to compete is

## III. LAW AND ANALYSIS

### A. Likelihood of Success on the Merits

MEMC brings seven causes of action in its Complaint, and each will be evaluated to determine the likelihood of MEMC's success on the merits.

### 1. Injunctive Relief (Claim 1)

MEMC asks this Court preliminarily and permanently to enjoin Balakrishnan in its first cause of action. An injunction, however, is a remedy, not a cause of action. *Hammond v. Citibank, N.A.*, No. 2:10–CV–1071, 2011 WL 4484416, at *11 (S.D. Ohio Sept. 27, 2011); *see Reyes v. Wilson Mem. Hosp.*, 102 F.Supp.2d 798, 801 n.1 (S.D. Ohio 1998) (noting that claim for injunction "does not constitute a separate legal claim for relief"). This Court need not consider MEMC's first cause of action in its likelihood of success evaluation.

### 2. Misappropriation of Trade Secrets in Violation of the Ohio Uniform Trade Secrets Act (Claim 2)

Under the Ohio Uniform Trade Secrets Act, Ohio Revised Code §§ 1333.61–69 ("UTSA"), "[a]ctual or threatened misappropriation may be enjoined." O.R.C. § 1333.62(A). A "trade secret" is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information

---

reasonable by clear and convincing evidence in order for there to be a viable claim for breach of the covenant under Ohio law); *Am. Sys. Consulting, Inc. v. Devier*, Case No. 2:07-cv-818, 2007 U.S. Dist. LEXIS 66339, at *5–6 (S.D. Ohio Sept. 7, 2007) (explaining that "[t]he moving party must demonstrate a right to injunctive relief by clear and convincing evidence," but that the four factors are not "prerequisites to be met"); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002) ("To be granted an injunction, the plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury," rather than all four factors) (internal quotations and citations omitted).

or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1333.61(D).

A plaintiff must establish the following by a preponderance of the evidence to maintain a claim for trade secret misappropriation: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam)).

When evaluating whether a party possess a trade secret, Ohio courts evaluate:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e. by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000).  Plaintiff has the burden of identifying and demonstrating that the alleged trade secret is included in categories of protected information under the UTSA, and must take active steps to maintain the secrecy of the trade secret.  *Id.*  Information "is entitled to trade secret status only if the information is not generally known or readily ascertainable to the public."  *Id.* at 379.  A court must evaluate whether the information has been disclosed to outside parties and whether security policies exist

to safeguard the information.  *Novak v. Farneman*, No. 2:10–CV–768, 2010 WL 4643002, at *3 (S.D. Ohio Nov. 9, 2010) (collecting cases).  The existence of a non-disclosure agreement is also a factor for a court to consider.  *Id.* at *3 (citing *ALTA Analytics*, 75 F.Supp.2d at 785).

"While individual pieces of information available in the public domain do not qualify as trade secrets, 'a new combination of known steps or processes can be entitled to trade-secret protection.'"  *Id.* at *4 (citing *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 411 (6th Cir. 2006)).  The same is true "even if some of the information is available in patent applications, so long as the entire trade secret is not revealed in the application."  *Id.* (citing *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F.Supp.2d 702, 713 (N.D. Ohio 2009)).

MEMC argues Balakrishnan cannot be trusted to protect MEMC's trade secret information.  The circumstances surrounding his furtive departure indicate intent to use MEMC's trade secret information to benefit Iosil.  MEMC also contends Balakrishnan took MEMC trade secret information and downloaded it onto his mass storage devices.  At least one MEMC document has turned up already at Iosil.  Plaintiffs urge that the Court "should disbelieve Balakrishnan's assertion that the eight portable storage devices did not (or do not) contain MEMC confidential and trade secret information."  (Doc. 49 at 13.)

Balakrishnan responds that MEMC is unlikely to succeed on the merits of its UTSA claim because it cannot demonstrate MEMC protects its trade secret information once it has been accessed properly.  MEMC is also unable to satisfy element (3) of its UTSA claim, that Balakrishnan acquired MEMC trade secret as a result of unauthorized use.  *See Heartland Home*, 258 F. App'x at 861.  Balakrishnan's use of MEMC's trade secrets was authorized, he claims.

MEMC has not sustained its burden of demonstrating that it is likely to succeed on the merits of its UTSA claim.  At the hearing, MEMC successfully demonstrated that trade secrets exist at MEMC and are integral to its business.  For example, when asked if intellectual property and trade secrets were important to MEMC, Dr. Milind Kulkarni, vice president and chief technology officer of the solar materials business, replied: "Absolutely.  That is the essential piece for our differentiation.  We are a technology company.  Without that, we cannot compete." (Doc. 44 at 17:7–11.)  According to Kulkarni, because of Balakrishnan's position as Director of Polysilicon Product Technology, he had access to confidential and trade secret information including, but not limited to: "[b]lue books and so-called processes of record, these are recipes that are used to run all different types of processes, and all the presentations we  were making that had confidential information which related to Pasadena technology for which Karthik was directly responsible, but also to other technologies such as Siemens technology."  (*Id.* at 21:24– 25, 22:1–5.)  The Court is convinced MEMC could satisfy the first element of *Heartland Home*. *See* 258 F. App'x at 861.

MEMC also demonstrated that trade secrets are acquired as the result of a confidential relationship.  Employees at MEMC, like Balakrishnan, sign agreements in which they agree to "use [their] best efforts and diligence both during and after [their] MEMC employment to protect the confidential, trade secret and/or proprietary character of all Confidential Information."  (Doc. 1-1 at 2.)  MEMC also, *inter alia*, limits access to certain information based upon an employees' level in the company, and allows access to the facility only with a badge.  The Court believes MEMC will most likely be able to satisfy the second element of its UTSA claim as well.

MEMC has more difficulty, however, with the third element of its UTSA claim.  The Court does not believe the likelihood of MEMC being able to prove Balakrishnan acquired

MEMC trade secrets as the result of unauthorized use is high. At the hearing, MEMC failed to show which, if any, trade secrets Balakrishnan was misappropriating or using without authorization.

Dr. Kulkarni was asked at the hearing if he was concerned that MEMC's confidential information and trade secrets may be compromised if Balakrishnan is allowed to work at Iosil. He responded as follows:

> As I mentioned, Karthik is technically highly competent. He's excellent. And he's aware of what MEMC does. He was directly responsible for significant portions of our polysilicon technology, and he had free access to all of our polysilicon technology. And Iosil is in the business of developing new polysilicon technology. And as I mentioned to you independent of the chemistry, what differentiates a competitor is how well you produce polysilicon in these three steps: making of gases containing silicon, purification of these gases, and production of silicon from these gases.
>
> So Siemens technology he has indirect knowledge of, and fluidized bed technology he directly understands it. So there are not too many other options for anybody as far as the reactors are concerned. And definitely Karthik's background, his capabilities and what he learned in MEMC is going to be of significant value to Iosil, and they're going to cut down the development time by many years. *And this is going to adversely affect all competitors.*

(Doc. 44 at 27:8–25, 28:1–6.) But the fact that Balakrishnan is good at his job and is highly competent should not factor into the Court's analysis with respect to the UTSA claim. Nor should the fact that Balakrishnan had *authorized* access to a number of MEMC trade secrets. MEMC needs to show that Balakrishnan misappropriated trade secrets through unauthorized use. "[S]imply being exposed to the possibility of misappropriation or threatened misappropriation, however, is not sufficient for [O.R.C.] § 1333.62 purposes." *Prosonic Corp. v. Stafford*, 539 F.Supp.2d 999, 1006 (S.D. Ohio 2008). MEMC "must establish actual or threatened misappropriation." *Id.*

MEMC attempts to show unauthorized use by pointing to the facts that Balakrishnan transferred data on mass storage devices prior to his departure and ran data deconstruction software.  If this was the only evidence for the Court to consider, it may be persuasive.  But Balakrishnan presented testimony at the hearing that the use of mass storage devices was commonplace at MEMC.  He also explained that he used the data deconstruction software to erase personal information from his computer.  Balakrishnan presented testimony and evidence that casts doubt on MEMC's position that Balakrishnan used the mass storage devices to transfer MEMC trade secrets and confidential information.  *See infra* Part I.A.5.  For example, MEMC failed to secure Balakrishnan's laptop once it was returned, and presumably anyone could have accessed the laptop between the time it was returned and the time Kroll analyzed its contents.  Moreover, for each file or link file that contained MEMC information and that was accessed on Balakrishnan's laptop in November 2011, Balakrishnan provided an explanation that linked the file or link file to a particular project he was working on that required him to access that file or link file.  Stated simply, MEMC has yet to identify one trade secret that Balakrishnan transferred improperly from his MEMC laptop.  It appears unlikely, therefore, that MEMC will be able to prove the third element of its claim.

MEMC argues this Court should, nevertheless, preliminarily enjoin Balakrishnan because of the doctrine of inevitable disclosure. Balakrishnan counters that MEMC will be unable to show the inevitable disclosure rule applies because it cannot show: (1) Balakrishnan had detailed and comprehensive knowledge of MEMC's trade secrets; (2) Iosil is a competitor of MEMC; and (3) MEMC trade secrets would be useful to Iosil.

Under the inevitable disclosure rule:

-15-

> [A] threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment.

*Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio App. 2000).  The reasoning behind this doctrine is that an individual cannot compartmentalize a competitor's knowledge and that disclosure or misappropriation of trade secrets is inevitable.  *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E.2d 62, 68–69 (Ohio App. 2005).  In Ohio, it is presumed that "a threat of harm warranting injunctive relief exists when an employee with specialized knowledge commences employment with a competitor."  *Contech Const. Prod., Inc. v. Blumenstein*, No. 1:11cv878, 2012 WL 2871425, at *11 (S.D. Ohio July 12, 2012).

While MEMC will most likely be successful in demonstrating that Balakrishnan has detailed and comprehensive knowledge of MEMC's trade secrets, MEMC will have more difficulty showing Iosil is a competitor of MEMC and that MEMC's trade secrets will be useful to Iosil.

First, at present, MEMC can buy polysilicon cheaper than it can manufacture it.  Its primary market segments are semiconductor materials, solar materials, and energy.  Iosil, on the other hand, is developing technology to purify silicon into polysilicon, using iodine.  It is not producing polysilicon yet.  One day, Iosil may compete with MEMC, but the companies are not competing right now.  Given these differences, it is not clear that MEMC's trade secrets will be useful to Iosil.  Moreover, Balakrishnan testified that his responsibilities at Iosil are different from his prior responsibilities at MEMC.  In fact, the knowledge he gained working on pilot plants and with new technology at General Electric for nine years, will be more useful than his experience at MEMC while he is at Iosil.

-16-

MEMC likelihood of success on its UTSA claim is not high, at least not high enough, to justify the "extraordinary remedy" of preliminarily enjoining Balakrishnan from working at Iosil. *See Leary*, 228 F.3d at 739.

### 3. Misappropriation of Trade Secrets Under Common Law (Claim 3)

MEMC argues that Balakrishnan misappropriated trade secret in violation of Texas common law in its third cause of action.  It does not, however, address the likelihood its success on this claim in its preliminary injunction briefing.[2]  Balakrishnan argues he did not violate Texas common law for the same reasons he did not violate the UTSA.  Without any case law or developed argument from the parties with respect to this claim, the Court will not consider this claim for purposes of determining MEMC's likelihood of success on the merits.

### 4. Violation of the Computer Fraud and Abuse Act (Claim 4)

Similarly, Plaintiffs do not discuss their likelihood of success with respect their claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C.  § 1030, et seq. ("CFAA").  Balakrishnan addresses this claim briefly in a footnote, and argues that Plaintiffs are not entitled to relief on their CFAA claim because there was no evidence the Balakrishnan has had access to MEMC's computer system since November 2011.  Again, because neither party elaborates on MEMC's likelihood of success with respect to the CFAA claim, this claim will not be considered for purposes of determining the likelihood of MEMC's success on the merits.

---

[2] In one instance in its reply brief, MEMC briefly mentions Texas and Missouri law in connection with an argument related to its claim under the UTSA.  (Doc. 50 at 14) ("Texas and Missouri law are in accord [with Ohio law].")  This blanket assertion does not provide the Court with sufficient information to address the likelihood of MEMC's success with respect to its third cause of action.

### 5. Breach of Contract (Claim 5)

MEMC brings a breach of contract claim alleging Balakrishnan has breached his agreement with MEMC.  *See infra* Part I.A.3.  MEMC argues that its likelihood of success with respect to this claim is high because its agreement is reasonable and its trade secrets and confidential information are a legitimate, protectable interest under Missouri law.  The fact that the agreement lacks a geographical restriction does not affect its enforceability because courts analyzing Missouri law routinely enforce covenants not to compete that do not contain geographical limitations.  Balakrishnan's work at Iosil clearly violates the terms of his agreement with MEMC.

Balakrishnan responds that Missouri courts construe covenants not to compete narrowly, and do not enforce restrictions that are meant merely to protect an employer from competition by a former employee.  Balakrishnan also argues that MEMC is seeking to do much more than prevent him from using MEMC trade secrets—MEMC is seeking to prevent him from working at Iosil altogether, which is an impermissible expansion of Missouri law.

The Court must engage in a two-part inquiry.  First, the Court must determine whether the agreement is valid, and second, if it is valid, whether Balakrishnan breached the agreement.  Under Missouri law, restrictive covenants are enforced in equity if they are reasonable under the circumstances and enforcement serves legitimate protectable interests, which includes trade secrets.  *Mayer Hoffman McCann PC v. Barton*, 614 F.3d 893, 908–09 (8th Cir. 2010) (applying Missouri law).  MEMC can use a "non-compete agreements to protect itself from unfair competition by misuse of its trade secrets."  *Healthcare Servs. Of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 613 (Mo. 2006).

The "Confidential Information" section of Balakrishnan's agreement will most likely be found valid under Missouri law.  During and after his employment, Balakrishnan is prevented from disclosing MEMC confidential information or trade secrets, and it is clear that under Missouri law MEMC can use an agreement to protect itself from unfair competition by misuse of this type of information.  *Id.*; *see Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239, 247–48 (Mo. App. 1993) (trade secrets and confidential information are a protectable interest under Missouri law).  For the same reasons MEMC is likely to be unsuccessful on the merits of its UTSA claim, however, it is likely to be unsuccessful in proving Balakrishnan has breached the "Confidential Information" section of his agreement with MEMC.  *See infra* Part III.A.2.

The Court is also concerned that the "Competitive Activity" language in MEMC's agreement goes too far by prohibiting any competition without a geographical limitation.  (Doc. 1-1 at 2–3.)  Under the agreement, Balakrishnan is prohibited, for a two-year period, from engaging in or contributing his knowledge to "*any* work or activity that involves a product, *process*, apparatus, service or development which is then competitive with or similar to a product, process, apparatus, service or development on which [he] worked or with respect to which [he] had access to Confidential Information while at MEMC at any time during the period of five (5) years immediately prior to such termination."  (*Id.* at 2) (emphasis).  For an employee like Balakrishnan, who was exposed to many different "processes"—a broad and undefined term in the contract in and of itself—while at MEMC, this provision effectively prevents him from working in his field after leaving MEMC.

Even more problematic is the fact that this language has no geographical restriction.  This Court finds unpersuasive the case law that MEMC cites to support its contention that "[c]ourts analyzing covenants under Missouri law routinely enforce covenants to not compete that do not

-19-

contain geographic limitations." (Doc. 49 at 28.) In all of the cases cited by MEMC, the courts found that the covenant at issue was not void without a geographical limitation specifically because it was only prohibiting the solicitation of a former employer's clients. *See Schott v. Beussink*, 950 S.W.2d 621, 627 (Mo. App. 1997) ("The absence of a geographical limitation in this case does not render the restrictive covenant unenforceable" because "the covenant does not prevent employees from practicing in any particular geographical area, it merely prohibits them from soliciting employer's clients"); *Mayer Hoffman*, 614 F.3d at 908-09 ("Although the restrictive covenants in this case are not restricted geographically, Missouri law recognizes that a customer restriction may substitute for an explicit geographical restriction."). The language in Balakrishnan's covenant not to compete is much broader.

Because MEMC likelihood of proving Balakrishnan breached the "Confidential Information" section of his agreement is low, and because this Court has doubts about the validity of the "Competitive Activity" language, MEMC is unlikely to succeed on the merits of its breach of contract claim.

### 6. Breach of Duty of Loyalty and Conversion (Claims 6 and 7)

Plaintiffs do not discuss their likelihood of success with respect to their breach of duty of loyalty and conversion claims. Balakrishnan argues these claims will be displaced under O.R.C. § 1333.67(A).

Section 1333.67(A) provides that, the UTSA displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Contractual remedies, other civil remedies that are not based on misappropriation of a trade secret, and criminal remedies, however, are not displaced under § 1333.67(A). Claims "which are based entirely on factual allegations of misappropriation of trade secrets" are barred by

§ 1333.67(A).  *See Miami Valley Mobile Servs., Inc. v. ExamOne Worldwide, Inc.*, Case No. 3:11–cv–158, 2012 WL 441148, at *12 (S.D. Ohio Feb. 10, 2012) (citing *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F.Supp.2d 722, 730 (N.D. Ohio 1999)).  "The relevant question is whether the facts supporting the common law claim are solely dependent on the same operative facts as the UTSA claim."  *Id.* at *13 (citing *Allied Erecting & Dismantling Co.*, 649 F.Supp.2d at 721).

MEMC's claims for duty of loyalty and conversion will likely be displaced by § 1333.67(A).  Both claims appear to be dependent on the same operative facts as MEMC's UTSA claim.  *See Miami Valley*, 2012 WL 441148, at *13; (Compl. ¶ 114–18) ("While employed at MEMC, Balakrishnan breached his duty to MEMC by wrongfully transferring MEMC's confidential, proprietary and trade secret information outside the company in order to, on information and belief benefit Balakrishnan and his new employer, Iosil, to the detriment of MEMC."); (*Id.* at 119–24) ("Balakrishnan wrongfully transferred MEMC's confidential, proprietary and trade secret information outside the company in connection with his secret departure from the company to join a competitor, Iosil.").  It is unlikely MEMC will be successful on its breach of duty of loyalty and conversion claims.

### B. Irreparable Harm

In the Sixth Circuit, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  More specifically, "[i]rreparable harm generally results from misappropriation of intellectual property by a competitor because of the potential for lasting and unjust competitive harm that would otherwise not occur."  *Ethicon Endo-Surgery v. Crescendo Techs.*, Case Action No. 1:07cv1016, 2009 WL

2707805, at *6 (S.D. Ohio Aug. 24, 2009) (citations omitted).  "[T]he loss of trade secrets

cannot be measured in money damages" because "a trade secret once lost is, of course, lost

forever."  *Novak*, 2010 WL 4643002, at *5 (citing *FMC Corp. v. Taiwan Tainan Giant Indust.*

*Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984)).

MEMC argues that both Ohio and Missouri law are clear that misuse or threatened

misuse of trade secret information cannot be fully or adequately compensated through monetary

damages, and injunctive relief is warranted as a result.  Balakrishnan contends MEMC's

argument that it will suffer irreparable harm absent a preliminary injunction is unconvincing

because it took two and a half months to file suit after learning that Balakrishnan was working

for Iosil.  Balakrishnan also notes that during the preliminary injunction hearing, Dr. Kulkarni

testified that the direct negative impact Iosil could have on MEMC as a result of Balakrishnan's

breach could be measured in dollars.

MEMC has not met its burden of demonstrating it will be subject to irreparable harm for

the same reasons it is not likely to succeed on its USTA claim—it has not shown that

Balakrishnan has, or threatens to, misappropriate MEMC trade secrets.  *See infra*, Part III.A.2.

### *C. Harm to Others*[3]

In evaluating the harm to third parties, the Court must "balance the harm a plaintiff would

suffer if its request for a preliminary injunction were denied with the harm the defendants would

suffer if they were to be preliminarily enjoined."  *Novak*, 2010 WL 4643002, at *6 (citing *Corp.*

*Exp. Office Prods. v. Warren*, Nos. 01-2521 DBRE, 01-2667 DBRE, 2002 WL 1901902, at *27

(W.D. Tenn. May 24, 2002)).

---

[3] Neither party addresses factors three or four in its post-hearing briefing.  Rather, the parties have
incorporated arguments by reference from prior briefing.

MEMC argues that the harm it will suffer as a result of Balakrishnan's misappropriation and breach outweighs the harm Balakrishnan would suffer if his employment with Iosil was terminated.  Because Balakrishnan entered into an agreement with MEMC willingly and knowingly, enforcing that agreement, MEMC argues, results in no inequity.  Balakrishnan argues the harm to MEMC is speculative at best.  Balakrishnan again asserts that he has not taken any trade secrets or violated his agreement with MEMC.  As a result, an injunction would simply prohibit him from engaging in the lawful activity of earning a living.

As explained above, MEMC has not shown that it is likely to succeed in proving that Balakrishnan misappropriated trade secrets and/or breached his agreement with MEMC.  Harm to MEMC is speculative at this point, while Balakrishnan clearly will be harmed if this Court enjoins him from working at Iosil because he will be unemployed.  This factor weighs in favor of denying MEMC's preliminary injunction motion.

### D. Public Interest

MEMC argues that granting a preliminary injunction in this case will promote public policy because the public has an interest in enforcing valid covenants and allowing employers to protect their valuable trade secrets.  Balakrishnan argues that granting a preliminary injunction in this case would undermine the public interest because there is no unfair or illegal activity to enjoin.

Enforcing the "Competitive Activity" section of Balakrishnan's agreement would not be in the public interest because this Court doubts that provision of the agreement is valid under Missouri law.  The public interest factor weighs in Balakrishnan's favor.

## IV. CONCLUSION

The balancing test factors all weigh in favor of denying MEMC's request to prevent Balakrishnan from working at Iosil.  This Court, therefore, **DENIES** MEMC's request to preliminarily enjoin Balakrishnan from working with Iosil until trial on the merits.  However, because this Court finds that the "Confidential Information" section of Balakrishnan's agreement with MEMC is most likely valid under Missouri law, MEMC's request to preliminarily enjoin Balakrishnan from using and disclosing MEMC's confidential, proprietary information and trade secrets is **GRANTED**.

**IT IS SO ORDERED.**

 s/ Algenon L. Marbley     
**Algenon L. Marbley**
**United States District Judge**

**Dated: September 11, 2012**